The next case for today is McCann v. Ogle County, No. 17-3139. All right, in McCann v. Ogle County, Mr. Maccatelli? Correct, your honor. Thank you. May it please the court. Opposing counsels? My name is James Maccatelli and I am the attorney for the plaintiff appellant in this matter. Before launching into the substance of my argument, I'd like to make comments on various legal standards. The court had requested that the parties provide a supplemental brief on a recent United States Supreme Court case, Miranda v. Lake County. That was the decision of this court. Correct. Actually, I'm sorry, the U.S. Supreme Court reversed the findings of this court. And I believe you, Judge Hamilton, were a... I think we're confusing two cases. Miranda, which was the recent decision by this court, which was interpreted in Kingsley, which would have been the Supreme Court decision about standards for treatment of pretrial detainees. Judge, I stand corrected and I apologize, you're incorrect. Go ahead. The Miranda decision is very important to our case, the McCann case, because the applicable standard changed from the subjective unreasonable determination to the objective unreasonable determination. The plaintiff no longer has to prove a state of mind on the defendants for their actual disregard of a substantial risk. Under Miranda, the plaintiff now has to prove defendant acted or failed to act purposely, knowingly, or recklessly with regard to plaintiff's medical condition. And defendant's action or inaction was objectively unreasonable. This changes the standard that was applied to McCann in the district court. Therefore, we ask the court to reverse the district court as it used the subjective standard. The defendants, Mr. McAtelly, have argued, however, that because Miranda changes the standard, at least, for example, Nurse Mongan would be entitled to qualified immunity if liability were threatened under the new changed standard. Could you address that point? Well, anytime you prove a violation of a constitutional right, there is no qualified immunity. That's not correct. Qualified immunity applies unless the official's actions violated clearly established law. Correct. Qualified immunity protects government officials for acts that they did not know or could not know were unlawful. In this particular case, the actual law itself has not changed. Inmates are to be provided with reasonable medical care or adequate medical care. And in this particular case, the standard has changed. Under the 14th Amendment due process clause, the pretrial detainees are entitled to more protection. It is found under the due process clause you cannot punish an inmate or a defendant until he has been convicted. So there is more protection that the court has interpreted. We try not to punish even convicted inmates with negligent medical care. All right. Is it correct that the estate has settled with the doctor in this case who prescribed the wrong dose of methadone? Yes. Okay. And how, in your view, should a due process claim against jail medical staff differ from a state law medical malpractice claim? And that's how I was going to distinguish Miranda case, which did not hold the jail employees responsible, when they relied reasonably on medical professionals. And in this case, that is not the facts. The facts are completely different. The sheriff in this case, Sheriff Vidal, never once spoke to the medical doctor that was providing care to the inmates at the Ogilvie County Correctional. Does he need to? Or can't he just assume that the medical staff is doing its job? You cannot. And especially in this particular case, when the medical staff was substantially inadequate and his officers in the jail repeatedly had asked him to remove McCann from their care, since they could not provide the reasonable care that he needed. They didn't have eyeballs on him 24-7, which they needed. McCann was a very special inmate. He had second and third degree burns on 40% of his body. He was released from a burn unit after 21 days of care because his Medicare insurance had run out. That is in the record. Sheriff Vidal knew that. He stated it to a newspaper reporter. There's some concern in this case that... The discharging physician thought that he could be appropriately treated. That's in the record too, right? If you had an adequate medical staff. In the record also, the doctor believed he was going to a facility that had an infirmary, which Winnebago County in Illinois does. That is where McCann first went. He went to Winnebago County because when he was released, the warrant was effective in Ogilvie County, but the hospital was located in Winnebago. The Winnebago Sheriff picked up McCann from the hospital, brought him to Winnebago, and immediately drove him to Ogilvie County Correctional Center. That's in a unique circumstance in the record also from the administrator, TACK, T-A-C-K, who explained, no, we usually wait for Ogilvie County to come and get this particular defendant. However, we did not want to have any risks or have any responsibility for him, so we drove him immediately. That's the condition that McCann was in. I think the court also has to take into consideration factors that the medical care that was provided here was not at all adequate. You had an LPN who cannot make any decisions, who must follow only instructions from an MD or an RN. There was no RN on duty, and there was a medical doctor only present two hours a week or four hours every two weeks. In this case, the medical doctor did not see McCann until the seventh day of his incarceration. The sheriff, Patel, had already made the decision to keep McCann, and that decision was made on a telephone call, strike that, on a meeting with the state's attorney at a county board meeting that night, April 20, 2010, the day that McCann was transferred to Ogilvie County Correctional Center. There was never a discussion about medical needs. There was never a discussion about whether or not there was a decision as to his medical condition that we could keep him here. Sheriff Patel made that decision himself. If we look at a reasonable person. Let me ask you. There obviously are a lot of reasons to second-guess some of those decisions at this point, but what concerns me is on keeping McCann in the jail or not in the jail is the causation issue the defendants have raised, saying, look, the problem was the doctor's error in prescribing too much methadone. That's what killed him, not the fact that he was in the jail. Right, but keeping him in that jail minimized his chance for survival, McCann's chance for survival. What evidence do we have on that? Had he been given appropriate medical care, the evidence in the record on April 30, 2010, when he was found unresponsive, the three or four hours before that there was some statement, and I strike that, back at 1 a.m., one of the jail guards, Deputy White, a normal individual, no medical training, no substantial education had explained that McCann's condition had changed, that he was unstable. He was wobbly. He was falling asleep at the time of breakfast. So there's a time frame that this deputy is watching him from 1 a.m. until 6 a.m. in the morning. But he was, I mean, Nurse Monahan checked on him the last time, what, at 8.09? Never once took a vital sign, which is the most. He got up out of bed, he drank the Kool-Aid, he went to the chair. Now, you're right, absolutely right, that the record shows he was groggy and having a difficult time staying awake. But what should she have done? Taken his vital signs? That she didn't do. She should have taken his vital signs, especially his respiration rate. Anybody on such a strong drug as methadone must. Given everything else she did, do you think that not taking his vital signs, you know, was reckless as to his health condition at the time? It was more than reckless. Was it completely objectively unreasonable? It was grossly reckless in this particular matter, because the first thing any medical professional does is check your vital signs. It's the first thing that you would do. And she kept an eye on him, remember, for 10 days, between the 20th and the 30th. Right, and the medical experts say that the signs of a methadone overdose, you're not going to see any visible signs. You're going to need to take the respiration rate. And if it falls below 8, you call 911 immediately, and that's what happened. McCann died from respiratory depression. He stopped breathing because he was on so high a level of narcotics. He no longer was breathing. And Nurse Mongan had stated, well, I didn't see him struggling to breathe. Well, you won't, because he's going to pass away very slowly during that three hours. Had he been given appropriate medical care or an appropriate RN who had knowledge of what to look for from narcotic intoxication or toxicity, he would have had a chance to survive. He would have been given the narcan drug, and it would have reversed the overdose consequences. And I'm sorry, Your Honor? You're into your rebuttal time, but you can use it as you wish. I will use this for my rebuttal time. Thank you. All right, thank you, Mr. McIntellie. Before appellees, I think we're going to be hearing from three of you, all right? So first, Mr. DeCiani. Thank you, Your Honor. May it please the court, counsel. I represent Cindy Mongan, the licensed practical nurse who has been named as a defendant in this case. If I were to go through the traditional saucier analogy standard, where we start with was there a constitutional violation and then go to was the law clearly established at the time, I could skip to Part 2, and I think I'd be done in a minute. But I will talk first about Part 1 here. Under any standard, there is no constitutional violation, to pin on Cindy Mongan, who was the licensed practical nurse who delivered daily consistent medical care to Mr. McCann, who spoke daily to the doctor about his care, who saw that he was sent to the hospital many times during the course of the 10 days he was there. There's no question that she followed the direction that she was given by the doctor and the hospitals on every instance. As a licensed practical nurse, she has limited options and limited capabilities under the Illinois Nurses Practices Act. She can only work and only follow the direction of a supervising registered nurse, or was not in this instance, or a doctor, and the doctor was Dr. Coulinan, and she spoke to Dr. Coulinan all the time. I think it's instructive to see what happened on those last three days. Dr. Coulinan changed the prescription on April 27th. On April 28th, Nurse Mongan saw that McCann was sent to the hospital for blood work, scheduled blood work. He was brought back. On April 29th, she talked to the doctor, told him about the blood work, told him about McCann's condition. McCann was doing very well. On the 30th, the morning where he was having problems, she attended to him. She gave him his medications. She treated his drinks so that he'd be able to drink because he had swallow problems. She changed his bandages. She put lotion on him. She attended to him as she had every day. She was in a position where she could tell if there was some distress going on, if something would alarm her to the point that she should take his vitals. But she didn't stop there. She called Dr. Coulinan and gave him all of the information regarding how Mr. McCann was doing that morning. And Dr. Coulinan gave her direction on how to handle it. He didn't say take her vital signs. He didn't say call 911. He didn't say, well, it sounds like he might be in some kind of distress as a result of the medication or anything else. So certainly under the deliberate indifference standard, that didn't meet that standard. Does it meet? What is the application of the objective reasonableness standard to that type of conduct? We don't have any guidance yet on that, but you have said two things about that in your Miranda decision. You've said that it can't be based on negligence. This is not medical malpractice. Even under due process and objective reasonableness, we're not talking about medical malpractice. Under Supreme Court precedent, there has to be a higher level of mens rea. It has to be at least reckless, and maybe that standard might not even meet the standard because we don't have that yet. But it has to be purposeful and knowingly. Well, what did she do? What did she do? She followed a doctor's directions. How can a licensed practical nurse be reckless, purposeful, knowingly take unreasonable measures following the doctor's directions? Now, plaintiff says that she knowingly administered methadone to McCann without any knowledge of the drug's reaction, side effects, or proper dosages. And that's why he believes that or argues that this is unreasonable objectively. Well, that makes it sound like she went out on the street and got him methadone or something and brought it to him without having any knowledge about it. She didn't know anything about methadone. They don't use it at the jail. The doctor prescribed it and she administered it exactly how it was prescribed. They say at one point she should have gone on the Internet to look at dosages. I said somewhat jokingly, is that because nothing on the Internet is incorrect? But there can't be a constitutional standard that requires a nurse to act that way, a licensed practical nurse. So this cannot be objectively unreasonable conduct by her. But go to the clearly established law part of it. If the standard wasn't clearly established until you came down with Miranda, after the Supreme Court changed the standard regarding the entire pretrial detainee situation, how could it have been clearly established in 2010 when all of this happened? Now, that's a view of the law. Even if you take a view of the facts and what facts were, what conduct was clearly established as, let's just say, improper by a jail nurse back then, there was case after case. The estate of coal case and other cases from this court which said that a nurse, unless it's obviously the doctor's prescribing arsenic or something, a nurse is allowed and is not indifferent by following a doctor's orders. So in terms of a factual course of action, that's what was in place at the time. It was not clearly established that that was improper. And the legal standard was obviously not clearly established. Thank you. Thank you very much. We'll next hear from Mr. Bersani. Good morning, Your Honors. May it please the Court, Mike Bersani on behalf of the jail superintendent at the time of this 10-day detention, Wendy Kerwin, individually. I also represent the Sheriff's Office and any official capacity claims in the county itself. Your Honor, this Court should affirm summary judgment on a number of bases here as it relates to my clients for a number of reasons. Number one, lack of proximate cause. Number two, the non-medical defendant here, Wendy Kerwin, relying upon the medical decisions and judgments made by the medical staff. Number three, qualified immunity, both on the merits question and the clearly established question Mr. DeCiani referenced. Finally, there's just insufficient evidence from which a jury could ever conclude that there's some O'Neill violation here on behalf of anyone in their official capacity. With respect to the proximate cause. Did I hear that the county government had a meeting on April 20th? It was not a meeting about this case. What he was referencing was the fact that the sheriff and the state's attorney had a private meeting at a county board meeting, so whether it was before or after, but it was only a meeting between the state's attorney and the sheriff in which they discussed Mr. McCann and the need for the sheriff to detain him. There was an arrest warrant for him. There was some privilege asserted around that discussion, according to the record, but what does the record show regarding the decision on April 20th to keep Mr. McCann at the OCCC, the Ogle County Correctional Center? What I'm getting at is, was that the product of medical judgment? And where's that in the record? Initially, it was the product of a discussion between the state's attorney and the sheriff. So when Mr. McCann showed up at the Ogle County Jail, there was communication to the sheriff that we have an inmate here who's got these conditions and getting some direction from the sheriff. The sheriff wanted to talk to the state's attorney, and once the sheriff found out there was an arrest warrant in which Mr. McCann was remanded to his custody, what resulted from that was the decision to detain him at the jail. From there, I think Mr. DeCiani addressed the medical issue or the medical judgment, which was the nurse communicated with the jail doctor, which was Dr. Cullinan, who was a contracted doctor that provided services through his company to the jail. But in a circumstance where you have an inmate with very acute health needs, let's just hypothesize it, wouldn't there be a requirement for medical judgment to be brought to bear upon whether the facility has the capacity and resources to appropriately care for the inmate? Absolutely, and I think that was done here, Your Honor, because the nurse came in off—she was off duty at the time. She came in once she learned about Mr. McCann's presence at the jail, assessed him, called the doctor right away, even called the hospital and got directions from both. And does the record show that Dr. Cullinan brought his judgment to bear upon the propriety of McCann staying at Diobel Center? Through his conversations with the nurse, yes. And under the contract that the county had with the doctor, it was the doctor's decision to advise the sheriff from a medical perspective whether or not an inmate's condition could be worsened by incarceration or whether some other measure needed to be taken. And we took Dr. Cullinan's deposition, and he admitted that, look, this was my decision, this was a medical judgment, and based on my medical judgment, there was no need to transfer this inmate out. Plus you have the testimony from Dr. Poulokitis and Dr. Puhn, who were the discharging doctors at the hospital, and they said that this man's wounds were healed well enough where he could be treated on an outpatient basis, whether at his house, by his family, or in the jail by correctional officers. In either circumstance, you didn't need any type of inpatient care under these circumstances. I see that my time is up unless you have another question. Thank you, Mr. Persaud. Thank you. And Mr. Zimmer? May it please the Court, Counsel. My name is Austin Zimmer. I represent former Sheriff Greg Bidle. Just to continue on Mr. Persaud's points, this Court should affirm summary judgment first because there's no proximate cause between Bidle's actions and McCann's death.  And the record in this case does not demonstrate that. Typically, causation may be an issue for a jury. But in this case, plaintiff's own admissions in this case, that McCann died of a methadone overdose, and plaintiff's testimony from their own expert, that is care and treatment for the burns at Ogle County did not cause his death, eliminate that causation issue. As to the deliberate indifference, plaintiff's argument essentially is that Sheriff Bidle was deliberately indifferent for failing to transfer McCann out of the OCC. But the record indicates clearly otherwise. The most important fact is McCann was at a hospital for three weeks, and then he was released from the hospital. And the doctor's testimony was he could even go home and have someone at home care for him. Plaintiff makes an argument in his brief that there was some sort of failure to transfer McCann out of the OCC because of financial concerns. There's nothing in the record that supports that at all. In fact, the opposite's true. Dr. Cullinan testified that it's his decision, his decision alone, to determine whether the OCC is capable of housing an inmate, and he made the decision that they were capable of that. Do you know when he made the decision? I don't mean to stump you on a fact, but do you know when he made that decision? He arrived there on the 20th. He was in constant communications with the nurse, and I think right away from that communications, he determined that, yes, we can care for him based on his conversations with the nurse. He did visit them on the 27th. The doctor visited him. So there was constant communication entirely between the nurse and the doctor, and there's nothing in the record at all that indicated that they weren't able to care for him. Counsel, weren't there some, at least some people, I thought we had evidence that some people in the jail thought it was a mistake. They didn't have the capacity to care for him. No, what happened originally is, I mean, literally, he showed up on our doorstep. There was some initial concern. This isn't a usual circumstance that happens. The jailhouse staff talked, the nurse talked, and right away, this was when Sheriff Bidel was involved. He said, let's fill the prescriptions, let's take care of him, let's read his discharge papers, and the discharge papers essentially were, you need to put on the medicine, the ointment, he needs to take that medicine. And that was taken care of right away. He was initially in one room. They ordered a hospital bed. So right away, they determined a plan to take care of him, and they fulfilled that plan, and they were able to do so, and everything was going, his treatment seemed to be going according to plan, and then the unfortunate methadone overdose, which was the cause of his death, which the plaintiff admits to, I think right away there, that defeats any potential liability for any of the other defendants. So there's nothing in the record that supports Bidel not wanting to transfer McCann off for any reason. No one ever said that to him. And then just lastly, on qualified immunity, plaintiff offers no case law that demonstrates any official acting similarly to Bidel is liable for any sort of constitutional violation. So accordingly, on behalf of Sheriff Bidel, we request that you affirm the district court's decision. Thank you, Mr. Zimmer. Thank you. Seeing Mr. McAtelly, rebuttal. Your Honor, in response to the three arguments that were made by the remaining defendants in this case, or the individual jail defendants in this case, Sheriff Bidel is responsible for the death of Mr. McCann. His decision to keep McCann incarcerated at Ogle County Correctional Center was based on his statement that a discussion with the state's attorney, we believe, we owe it to the community, that we are going to keep this man who is dangerous in custody. He never once, in his deposition, he acknowledges, meaning Bidel, acknowledges that he never spoke to Cullinan. He never visited the jail to look at, to view McCann. He relied on his captain and his sergeant, Kerwin and Ashley, to provide the appropriate care for McCann. He can't do that? No, because those individuals are the ones that came to him explaining to him, we cannot appropriately care for this man, please get him out of this jail. And, Judge, in the reply brief I explained, or in the brief also, they went to the new sheriff who was elected and going to take office in a few months, asked him to intervene. They, meaning the jail employees, went to the public defender who was representing McCann in the criminal case and asked him if he could do something. Nobody wanted to go against the sheriff. They were all concerned about their job. And the public defender states that in his deposition. He didn't push it. There's a big difference in what you're saying, and I think what you want us to conclude from that, and that is that the sheriff overruled the medical judgment of Dr. Cullinan to keep Mr. McCann at the center. There's no evidence of that, is there? That's not what I'm saying, Your Honor. I'm saying that he is the man, the sheriff, Bidel, is the one to make the decision whether or not McCann stays or goes. He relies on his employees. He's informed on medical judgment. He can rely on medical judgment, but he never, ever requested any opinion from any medical professional. And he cannot ask Nurse Mongan for an opinion because she's an LPN. She doesn't have the capability to provide an opinion as to treatment, doesn't have the ability to provide a plan of care, or she can only enforce the plan of care as instructed by an RN and an MD. It's extremely important in this case that we keep saying that there's a medical judgment here, and this is why we distinguish it from the Miranda case and say that these particular jail employees have responsibility. They closed their eyes and they did whatever the sheriff said, and they were not going to go against that sheriff regardless if McCann died. Is it correct that we've got testimony from Dr. Cullinan, though, saying, as we were told, I made a judgment the jail could handle him appropriately? I believe that was his testimony in his deposition, but there's no record to substantiate that. There's nothing in the medical records that state, yes, I believe we can appropriately care for this individual. That's something that comes up after litigation is filed, and it's two, three years later. It's a credibility issue. It's a credibility effect. What's the contrary evidence? The contrary evidence is the fact that the sheriff has explained himself that he had never spoken with the medical doctor. In addition, we have a medical doctor who has a contract with the county to provide medical services. He receives a reasonable sum of money for his services. He does not want to rock the boat and cause any conflicts with the sheriff, so he abided by what the sheriff decided. In this particular case, the court has to look at the facts that this man died within 10 days. It wasn't 30 days. It wasn't a year. It wasn't six months. It was 10 days, and he died because there was not a medical staff. In the Miranda case, there was a reasonable medical staff. There were many doctors. There were many nurses. They were there daily. They observed the patient. They treated that patient daily. What we have here is an LPN who doesn't have any medical knowledge regarding this acute injury, the acute injuries that McCann sustained or suffered. She's the one who cares for this man. She's over her head. She comes in on her days off, and she watched this man die because she refused to go against the sheriff's statement that, no, we're going to keep this man here. In closing, I ask the court to take into consideration Captain Kerwin. She wrote a report days after McCann's death. She acknowledges in that report that they could not provide the adequate medical care to McCann. She says, I will never say we could provide the adequate medical care to McCann. She was the officer that was responsible to get additional medical personnel to help care for McCann, to provide 24-7 observation and treatment for him. She called one nursing facility only. They said, we don't have any nurses. They never tried to get any additional care afterward. That action is unreasonable. Thank you. Thanks to counsel for all parties. The case is taken under advisement.